200-10

STATE OF MAINE                          SUPERIOR COURT
PENOBSCOT, SS.                          CIVIL ACTION
                                        Docket No. RE-02-39

Barry Higgins,
        Plaintiff


        v.                              Decision and Judgment


Leo Higgins et al.,
        Defendants


Trial in this matter was held on several days in July 2004. On those dates, the parties were present with counsel. The amount of courtroom time allocated for this case proved to be insufficient. Accordingly, the parties developed additional testimony through a deposition process and subsequently filed the transcripts. The parties then filed written argument. The court has considered the trial record and the parties' written summations.[1]

This action arises out of disputes that relate, both directly and indirectly, to the ownership and operation of a trailer park located in Carmel. Plaintiff Barry Higgins and his father, defendant Leo Higgins, jointly acquired the trailer park in 1972. They agree that with that joint acquisition, they became partners in the trailer park venture. Their relationship failed in 1989. In this action, Barry seeks a distribution of the partnership assets, or compensation for his equitable share in them. He makes additional claims against Leo and the other defendants, who are members of the Higgins family,[2] alleging that they converted items of personal property that he owns and that were located on the trailer park premises, and Barry further claims that they are liable to him for unlawfully evicting him from an apartment that is also located on the trailer park premises. In a

---

[1] The court regrets the length of time the court has had this case under advisement and thanks the parties and counsel for their patience.

[2] Defendants Irene Higgins and Cynthia Prescott are two of Barry's siblings, and defendant David Prescott is Cynthia's husband.

1

counterclaim, Leo alleges that Barry has failed to turn over lot rental payments he collected and that Barry converted items of personal property.

### Partnership claims

Barry and Leo agree that between the time they acquired the trailer park in 1972 until at least 1989, they were partners in the trailer park's business. In 1989, Barry executed a quitclaim deed, conveying his interest in the property to Leo. Leo thereby acquired sole ownership of the property. Additionally, in 1991, Barry gave Leo the documents that were used to accompany the payments made on the mortgage for the trailer park property, and Barry told Leo that the debt was no longer his responsibility. The question raised by the 1989 conveyance is whether Barry dissolved the partnership by transferring his ownership interest in the trailer park to Leo, particularly when that transaction is combined with Barry's disavowal of responsibility for the trailer park debt several years later.

Without conceding that the trailer park is a partnership asset, Leo first contends that he and Barry owned the trailer park property as tenants in common, which in fact is the form of their ownership interests as described in the deed of conveyance. From this evidence, Leo then argues that the property was not a partnership asset but rather that they individually owned separate but undivided fractional interests. Leo asserts that when Barry conveyed his own interest in the property to Leo in 1989, he (Leo) came to own the entire parcel and that because it never was a partnership asset, it not subject to any partnership-based claim that Barry could pursue here. Leo's argument is based on the terms of 31 M.R.S. § 288.[3] That statute provides that if property acquired prior to October 3, 1973, is acquired in the partnership name, then the property is treated as partnership property and not as property owned by the partners individually as tenants in

---

[3] Section 288 is part of the original Uniform Partnership Act, 31 M.R.S. § 281 et seq. (UPA). The original UPA was repealed effective July 1, 2007, and replaced by a new version of the UPA. See 31 M.R.S. § 1103. See P.L. 2005, c. 543, pt. A. The UPA enacted in 2007 expressly applies only to partnerships formed after July 1, 2007, unless a partnership already in existence as of that date elected to be governed by the new laws. 32 M.R.S. § 1104. The Higgins' partnership was formed prior to July 2007, and it did not opt into the new act. As the parties agree, the law applicable to this case therefore is found in the original UPA. Therefore, the references to the UPA in this order are to the UPA that was repealed in 2007.

common. Leo reasons that because he and Barry acquired the trailer park individually as tenants in common and did not place ownership in the name of their partnership, the land is not deemed statutorily to be partnership property. Although this argument may be affected by an error in logic,[4] the court need not formally address its merits, because in the end, the court concludes that for other reasons, Barry is not entitled to pursue a claim to any partnership property. This is the same outcome that Leo urges is the result of his analysis under section 288, but the court reaches that conclusion for different reasons.

In 1972, Barry and Leo purchased the trailer park from one John Graham, who had owned the property for one year.[5] After some negotiations, Barry and Leo agreed to pay Graham $10,000 and assume liability under a promissory note that Graham had executed previously in order to buy the property. After they bought it, the Higgins' changed the name of the facility from "T&N Trailer Park" to "Autumn Meadows Trailer Park," seeking a more descriptive term to reflect their plan to attract older residents. Residents would live in mobile homes that they owned, but those residents would pay monthly rent to occupy space in the park. Leo paid the $10,000 down payment, and he then paid the taxes and maintenance expenses generated by the park. Barry's contribution toward the venture was to perform much of the maintenance work around the premises. The rental income from the trailer park's residents, which was $25 per month for a lot, was sufficient to cover the mortgage payments.

At the time Barry and Leo acquired the trailer park, it had the necessary state regulatory licenses to operate. However, because of problems with the septic system servicing the trailers in the park, the park's licenses were revoked in 1976 or 1977. Barry and Leo were able to renegotiate the terms of the loan they assumed from Graham to pay

---

[4] By its own terms, section 288 controls the ownership status of property acquired in the name of the partnership. Here, in contrast, Barry and Leo acquired the property in their individual names as grantees. From the statutory principle that property acquired in the partnership name does not become owned by the partners as tenants in common, Leo argues that property acquired by the partners as tenants in common does not become owned by the partnership. The latter conclusion may not follow from the former principle.

[5] For reasons that are not clear in the record, Barry and Leo did not receive a deed from Graham until 1981, *see* plaintiff's exhibit 144, even though they took over the operation and possession of the trailer park nine years earlier.

3

the previous owner, and after they secured financing, they extinguished that debt. As security for this new loan, the mortgagee obtained an interest in personal property that Barry claims was his. Barry and Leo again refinanced in 1986, borrowing $60,000 with the intent to use these proceeds to pay off the existing note and to pay for improvements to the septic system in the trailer park. With this transaction, the security interest in the personalty was released. A year or two later, the trailer park was relicensed, this time for 44 sites. During the time when the trailer park was generating reduced amounts of lot rental income due to the licensing problems, Barry was paying most of the monthly mortgage payments, although Leo also contributed money toward those payments when Barry asked him to do so.

In 1989, Barry's wife, Patricia, commenced a divorce action against him. Barry was represented by counsel, Julio DeSanctis, Esq. While the divorce action was pending, Barry and Leo both executed a warranty deed that conveyed to Leo sole ownership of the trailer park. *See* plaintiff's exhibit 151. Barry executed the deed after consultation with DeSanctis. That deed was then recorded with the Registry of Deeds. Through this recorded conveyance, Leo became sole owner of the trailer park property. Indeed, Barry explained that he executed the deed to prevent Patricia from obtaining an interest in the trailer park as part of the divorce proceeding. Barry testified that this conveyance of his ownership interest to Leo was intended, when the time was right, to be followed by Leo's reconveyance of title back to Barry and Leo jointly and that the *status quo ante* would thereby be restored. Barry further testified that DeSanctis intended to draft the second deed that Leo would execute simultaneously with the first deed. However, Leo did not execute a second deed, and so the property remains in his name exclusively.

As a factual matter, the court rejects Barry's testimony that he and Leo intended to reconvey the land back to himself and Barry jointly. One of Barry's sisters, Jacqueline Higgins, was DeSanctis' secretary at the time the one deed was executed. She signed the deed as a witness, and in fact she prepared the deed. She testified that in fact she did not prepare a second deed and that DeSanctis did not instruct her to prepare one. The court accepts this account as reliable. It is unlikely that she would fabricate a denial of Barry's testimony that there was supposed to be a second deed, because of the prospect that if DeSanctis *had* told her to draft the second deed to undo the effects of the deed that Barry

4

and Leo in fact signed, he (DeSanctis) might be available to refute that denial. In other words, Jacqueline would be dissuaded from testifying falsely that Barry and DeSanctis arranged for Leo to re-convey an ownership interest back to Barry, because if there had been such a plan, it is likely that she would expect that DeSanctis would rebut her claim – again, if it were untrue.

The court also notes that although Barry now insists that Leo was supposed to sign the second deed to restore title to him, Barry never made a recorded complaint that DeSanctis – who was Barry's own attorney in the divorce case – failed him in this way. Barry also testified that at the time he did not complain to Leo about the situation,[6] and he never sought counsel to address matter, although subsequently he had the benefit of legal representation on other matters. If Barry had been denied a reinstatement of title to an asset of importance to him, one would expect that he would have taken steps to complete the transaction that he alleges was to have occurred or to make a complaint that would be a matter of record.

Barry testified that at one point, DeSanctis assured him that Leo would execute the second deed that would restore Barry's ownership interest in the property. However, Barry also testified that when the second deed was not forthcoming within several months after he renounced his title, he asked DeSanctis when he would receive the second deed to restore that title. DeSanctis' reply, according to Barry, was to ask, "What deed?" Therefore, part of Barry's own testimony includes a denial by DeSanctis that Barry would receive a deed to erase the effects of the earlier one that Barry claims was used to defeat any claims to the property in the divorce action. In effect, Barry's contention is that he was defrauded of an ownership interest in the property and that DeSanctis was a party to that fraud. Despite this serious accusation that, if true, would have a substantial effect on Barry's financial well being, he did nothing about it. Therefore, viewing the evidence as a whole, the court finds as a factual matter that conveyance of full title to Leo was the only intended result and that Barry did not plan or expect to re-acquire an ownership interest in the trailer park property.

---

[6] Barry testified that several months after he signed the deed to Leo, he asked Leo about the alleged second deed. Barry did not pursue the matter further.

5

There are several other evidentiary factors that bear on the question of the partnership's status as of 1989 and the next several years. First, between 1972 and 1989, Barry and Leo filed partnership tax returns for the trailer park. After 1989 – the year Barry relinquished his ownership interest in the trailer park, they stopped this practice. Second, even after Leo acquired full ownership of the land in 1989, Barry continued to make some of the mortgage payments. This, however, stopped in 1991. Barry gave Leo the payment book and told him that he (Leo) could make the payments or lose the property through a default on the secured loan. From that point, Barry did not make any further payments toward the trailer park's expenses.

From this evidence, Leo argues that at least by 1991, when Barry surrendered the mortgage payment book to Leo, the partnership was dissolved. The court agrees. Under controlling statutory law, a partnership is dissolved by the express will of a partner to a partnership that is not subject to a definite term or particular undertaking. 31 M.R.S. § 311(2). The Higgins' trailer park business was to be an ongoing venture and thus not subject to a definite term of time or a particular undertaking. Accordingly, the Higgins' partnership was liable to dissolution with Barry's express will to end it that way. In this way, it was an "at will" partnership. *See Clapp v. LaBoeuf, Lamb, Leibuy & McRae*, 862 F.Supp. 1050, 1057-58 (S.D.N.Y. 1994), *aff'd* 54 F.3d 765 (2nd Cir. 1995) (applying New York law identical to section 311(2)). A partner's expressed will to withdraw from a partnership may be revealed directly or proven inferentially through conduct that reveals an intent to abandon or withdraw from the partnership entity. *Kruse v. Vollomar*, 614 N.E.2d 1136, 1140 (Ohio App. 1992) (applying Ohio law identical to section 311(2)); *cf. Smith v. Maine*, 260 N.Y.S. 409 (N.Y.Sup. 1932) (common law).

The court finds that no later than 1991, Barry had expressly manifested a will to withdraw from the partnership, which was equivalent to its dissolution because there was only one other partner, namely, Leo: at that point, the business became a sole proprietorship. Barry's express intention to withdraw as a partner therefore necessarily dissolved the partnership. The court concludes that it was Barry's will to dissolve the partnership when, in 1989, he conveyed his interest in the major partnership asset to the other partner, Leo; when he no longer participated in filing partnership tax returns after that year; and, if the partnership had not been dissolved by then, when in 1991 he

6

disclaimed any further responsibility for making most of the mortgage payments, as he had been doing since approximately 1976.

Barry contends that he had reasons for each of these acts that do not evince a will to dissolve the partnership. As is noted above, he contends that he did not want the trailer park property in his name so that he could shield it from any claim that Patricia might make against that asset in the divorce case. He next argues that he did not accrue any real tax benefit from the partnership tax return and therefore agreed to let Leo claim business expenses on his own return, because they were of greater benefit to him. Finally, Barry alleges that he turned over responsibility for the mortgage payments to Leo because Leo would not put Barry back on the deed, as Barry claims he and Leo originally agreed was to happen. Particularly when Barry's separate acts are viewed as components of a larger pattern of conduct manifesting an intention to dissolve the partnership, his explanations are not persuasive. And in this context, it is worth noting Barry's argument that even if the trailer park property came into Leo's sole ownership, it could remain a partnership asset. This would mean, in the context of Barry's divorce, that the 1989 conveyance by itself would not defeat a claim by Patricia that Barry had a continuing interest in the asset, but now as a partner rather than as a record owner. Therefore, based on Barry's own legal analysis, the only way he could insulate the property from consideration in the divorce case would be if he relinquished not only his ownership of the trailer park property but his interest in the partnership itself. Such an express will is then shown even more persuasively by the cessation of Barry and Leo's practice of filing partnership tax returns and, two years later, Barry's express statement to Leo that he would not make any more payments toward the mortgage on the land.

Based on this, the court concludes that Barry's conduct served to dissolve his partnership with Leo no later than 1991. In this action, Barry seeks an accounting of the partnership affairs pursuant to section 302 of the UPA (count 1 of the complaint) and a constructive trust encompassing the trailer park property (count 2). An accounting would form the predicate for a distribution of the partnership's net assets pursuant to section 320. However, a partner's claim for an accounting accrues "at the date of dissolution, in the absence of any agreement to the contrary." 31 M.R.S. § 323. This means that Barry's partnership-based claims accrued no later than 1991.

7

Barry's claim for an accounting and distribution of partnership assets is subject to a six-year period of limitations. *See* 14 M.R.S. § 752. Without citing any supporting authority, Barry argues that because the partnership-based claims are equitable, they are not subject to the statute of limitations created in section 752. However, section 752 applies to "[a]ll civil actions" that are not specifically subject to some other statutory period of limitations. This comprehensively framed scope of applicability certainly includes the claims at issue here. Further, the reasons for imposition of a period of limitations –"to provide eventual repose for potential defendants and to avoid the necessity of defending stale claims," *Dowling v. Salewski*, 2007 ME 78, ¶ 11, 926 A.2d 193, 196 (citation omitted) – apply just as importantly in equitable actions as they do in cases with claims at law.

These claims accrued no later than 1991, but Barry did not commence this action until 2002. Consequently, these claims for an accounting and distribution are barred by the period of limitations and cannot be maintained in this action.[7]

### Quantum meruit and unjust enrichment claims

Barry argues that if he is not entitled to participate in the distribution of partnership assets or receive compensation for his interest in the partnership, he is entitled

---

[7] As one of his arguments in this case, Barry alleges that Leo promised to convey to him a lot that was part of the trailer park premises but that Leo instead eventually conveyed to John Higgins. Barry expressly does not seek to acquire title to the lot as part of any relief in this action. *See* plaintiff's summation at 15, n.6. Rather, Barry frames his argument relating to the lot as part of the overall claim that he is entitled to relief based on his interest in the partnership. Just as Barry's partnership-based claims are barred generally, any particular argument arising from the disposition of the lot is also barred.

Even if Barry may be seen to make a claim for the value of the lot independent of any claim arising from the partnership, he has failed to establish the basis for relief. The only evidence of the value of that lot is found in plaintiff's exhibit 189, which consist of municipal tax assessment records for that parcel. Barry offered that exhibit into evidence as part of his rebuttal testimony, which was part of the evidence developed through deposition. When Barry offered the exhibit, the defendants objected. The court sustains that objection here. It does not constitute proper rebuttal evidence, because it would relate squarely to an essential element of Barry's claim arising from the disposition of the parcel and is properly presented as evidence during his case-in-chief. Further, from the transcript, it appears that Barry had not produced or identified the trial exhibit to the defendants prior to trial. Therefore, it is excluded because of the absence of timely disclosure.

to compensation for work he performed and materials he provided for the benefit of the trailer park. He frames these claims as ones for quantum meruit and unjust enrichment.

A claim for quantum meruit is predicated on proof that, in the absence of an express contract, a plaintiff rendered services to a defendant, that the defendant knew of and consented to those services, and that under the circumstances it is reasonable for the plaintiff to expect payment for those services. *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269, 271. Thus, the jist of a quantum meruit claim is the existence of an implied promise where the formal elements of an express contract do not exist. *Id.*, ¶ 9, 708 A.2d at 272. A promise to pay or perform may be found "when the surrounding circumstances make it reasonable for him [the performing party] to believe that he will receive payment from the other." *Id.*, 708 A.2d at 272 (citation and punctuation omitted). The reasonableness of that belief flows from the performance of services "under circumstances consistent with contractual relations." *Id.*, 708 A.2d at 272 (citation and punctuation omitted). *See also Danforth v. Ruotolo*, 650 A.2d 1334, 1335 (Me. 1994). In a successful claim for breach of an implied contract under quantum meruit, damages are assessed by the reasonable value of the services that were performed. *See William Mushero, Inc. v. Hull*, 667 A.2d 853, 855 (Me. 1995).

Barry's alternative claim for unjust enrichment is an equitable remedy that is available "when no contract exists." *Cummings v. Bean*, 2004 ME 93, ¶ 9, 853 A.2d 221, 224. A claim for unjust enrichment is predicated on evidence that a plaintiff conferred a benefit on a defendant, that the defendant had an appreciation or knowledge of that benefit, and that the defendant's acceptance or retention of that benefit makes it inequitable for the defendant to retain that benefit without payment for its value. *Forrest Associates v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 14, 760 A.2d 1041, 1045-46. Because the receipt or acceptance of a benefit is at the heart of a claim for unjust enrichment, the measure of damages is "the value of what was inequitably retained." *See Paffhausen v. Balano*, 1998 ME 47, ¶ 7, 708 A.2d 269, 271.

Any claim for recovery under either theory would be limited to services rendered and materials provided within six years of the date Barry commenced this action. This means that, due to the statutory time bar, Barry is not entitled to recover for the reasonable value of his services (quantum meruit) or the value he conferred on Leo

9

(unjust enrichment) during the time that he and Leo were partners. This is significant, because as a partner, Barry would have expected to receive a return for his work benefiting the partnership, and Barry would have been entitled to such a return if the value of the partnership enterprise were enhanced due to his efforts. In other words, Barry's work during the time when he was a partner may have established a basis for relief under either theory of recovery, if, for some reason, he was unable to obtain that relief in his capacity as a partner. But because Barry renounced his interest as a partner no later than 1991, his claims based on theories of implied contract and unjust enrichment necessarily exclude the period of time when he was a partner. Beyond this, any claim for recovery under either of these theories is limited to an accrual of rights within the six-year period of limitations. However, because the statute of limitations is an affirmative defense of avoidance, *see* M.R.Civ.P. 8(c), the defendants bear the burden of proving that all or part of Barry's remaining claims are time-barred.

Barry argues that he is entitled to recover under either of these theories, based on evidence of mortgage payments he made toward the trailer park property, deliveries of gravel to the premises, work he performed on the septic systems in the park, and construction work on several garages and the building where the apartment and downstairs garage are located.

The evidence establishes that several of these bases for Barry's quantum meruit and unjust enrichment claims are barred by the statute of limitations. Barry stopped paying toward the mortgage debt in 1991, and so any claim for recovery of those payments expired well prior to the time he commenced this action. Similarly, Barry constructed the garages on the trailer park property in the mid-1980's.[8] He also testified that the building with the apartment was built around the time he executed a mortgage deed in 1981, *see* plaintiff's exhibit 145, and, according to his own testimony, he moved into the apartment in 1982. Therefore, his right to seek recovery based on any of the mortgage payments he made and based on any of this construction work therefore

---

[8] Barry testified that he constructed those two outbuildings in approximately 1986 or 1987.

10

became barred well prior to the time he initiated this lawsuit. This leaves his claim arising from the delivery of gravel to the trailer park premises.

Barry presented evidence that between 1973 and 2001, he or his company, Higgins Construction,[9] hauled a total of between 30,000 and 40,000 cubic yards of gravel to the park premises, largely to be used to construct septic systems on site. Of this quantity, he removed roughly 5,000 yards, leaving a net amount of between 25,000 and 35,000 in the park. In 1973, gravel had a value of $1.50 per cubic yard. By the late 1990's, the cost of a cubic yard had increased to $8.

The court first considers Barry's argument that he is entitled to recover the value of the materials under a theory of implied contract (quantum meruit). In order to prevail on this claim, Barry must prove, among other things, that he reasonably expected to receive compensation for the materials and services he provided. He has failed to prove this point. Because Barry had withdrawn from the partnership, he could not expect that he would achieve some eventual gain from the materials and services he provided to he business, in the form of an enhancement of his position in the business arising from an increase in the value of the park. Therefore, one must look elsewhere for evidence that he reasonably expected to receive compensation for his contributions to the park, in which he no longer had a direct stake. That evidence could take several different forms. It might include an agreement between Barry and Leo that Barry would receive payment for the gravel and associated labor. Barry has acknowledged, however, that such an agreement did not exist. Evidence of an expectation of payment could also take the form of a bill that a contractor might send to the property owner. Again, Barry testified that he did not send a bill to Leo or to anyone else for the gravel and the work involved in delivering and integrating it into the premises. Finally, such evidence could include even a statement or other communication made by the contractor to the property owner that he (the contractor) was owed money for the goods and services. Barry testified that he did not tell Leo in any way that he (Leo) owed him (Barry) money for the contracting work.

Thus, even though Barry may have brought gravel into the park over the course of at least a decade following Barry's withdrawal from the partnership, Barry never engaged

---

[9] Barry's business was an unincorporated proprietorship, and so any basis for recovery by the business is a claim that Barry may pursue individually.

11

in any act that indicating some expectation of payment. Beyond this, even though neither Leo nor any representative of the park paid Barry for any of this ongoing work, Barry alleges that he continued to perform the work despite the absence of payment or a demand for payment. In this way, Barry's involvement in the park was similar to that of other family members, who made contributions toward its improvement and operation without apparent compensation. From this, the court finds Barry did not have any expectation – reasonable or otherwise – that he would receive payment for any improvements he made to the trailer park. This failure or proof defeats Barry's claim for quantum meruit.

Alternatively,[10] Barry seeks recovery based on an equitable claim of unjust enrichment. As is noted above, the measure of damages for unjust enrichment consists of the value of the benefit wrongfully retained by the respondent (as opposed to the value of the performance provided by the claimant, which is the measure of damages for quantum meruit). Here, even if the evidence is sufficient to support the remaining elements of a claim for unjust enrichment, the evidence falls far short of allowing any quantification of the extent to which Barry's work on the park premises increased the value of that property.

In his argument, Barry takes several approaches in his attempt to prove damages on his unjust enrichment claim. First, he notes the putative increase in the value of the premises between the purchase date in 1972 and 1991, when it was appraised. Then Barry posits two-thirds of the increase as the amount he claims he is entitled to recover.

Both elements of this equation are problematic. First, the 1991 value of the trailer park cannot be used, because Barry is not entitled to recovery for any contribution he made prior to 1996 (six years prior to the date he commenced this action), and so the value of the property five years prior to that date does not shed light on the increase in the value of the property starting five years later and then running between 1996 and 2002.

---

[10] As is noted above, recovery under theories of quantum meruit and unjust enrichment are mutually exclusive, because the equitable claim of unjust enrichment can be pursued successfully only against a party with whom the claimant did not have a contract-based relationship. *Cummings*, 2004 ME 93, ¶ 9, 853 A.2d at 224. Thus, the court considers Barry's claim for unjust enrichment because he has not proven that he had an express or implied contract with Leo.

12

Second, Barry's proposed two-thirds allocation between the increase in value attributable to his work and the work of others has no meaningful basis in the evidence and ultimately must be seen as speculative. Therefore, Barry's first argument on damages is not persuasive.

Barry then contends that his recovery for unjust enrichment can be based on the value of the contributions he made to the property. This, however, is not the correct measure of damages for an unjust enrichment claim. If the court invoked this measure of damages, then it would graft the contract damages analysis tied to a quantum meruit claim onto the liability theory of unjust enrichment, thereby erasing the difference in the two measures of damages expressly created by the Law Court.

For these reasons, even if the evidence supported the remaining elements of proof on a claim for unjust enrichment, Barry has not established the amount of damages he would be entitled to recover upon such proof.

**Conversion of personal property**

As an independent cause of action in this case, Barry seeks recovery for a number of items of personal property that he claims he was forced to leave behind on the trailer park premises when he was removed from the property in 2002.

The first step of the analysis of this claim is to try to identify the items of personalty at issue. This is not an easy task. Barry provided testimony at trial on this issue, and the evidence includes lists and many photographs. The court has attempted to correlate all of this evidence. As it relates to the question of value, Barry's argument focuses on three lists of personal property: plaintiff's exhibit 146 (a U.C.C. statement used to secure a loan in 1981[11]); plaintiff's exhibit 155 (Barry's statement of assets and liabilities from 1991); and plaintiff's exhibit 163 (an itemization of personalty prepared for trial). There is clearly some overlap among these lists, but the extent of the overlap is not always apparent. In his trial testimony, both during direct and cross-examinations, Barry was asked to focus on the personal property described in two of those documents, namely, exhibits 146 and 163. The extent to which he may have described other items of

---

[11] This is the loan, noted earlier in this opinion, by which Leo and Barry obtained money to pay off a loan they assumed from the prior owner of the trailer park.

property not included in those lists is difficult to determine. In light of the minimal evidence relating directly to exhibit 155 and the age of that document, and in light of the questions about other property to which he may have referred during his trial testimony, the court uses exhibits 146 and 163 as the best and clearest evidence of the scope of Barry's conversion claims. The court relies on those documents as the best expression of the property that is the subject of his claim for conversion, and the court further considers testimonial evidence about those items in evaluating his claim.

However, to further complicate the matter, Barry testified that at the time of the alleged conversion, he no longer owned some of the property described in exhibit 146, which is a document created in 1981, more than twenty years prior to the alleged conversion. The evidence also establishes that Barry freely and happily traded items of property and, in particular, equipment. Particularly in light of the constantly changing inventory of Barry's personalty, the lapse of time between the creation of the list in exhibit 146 (1981) and the time he claims the defendants converted the property (2002 and later) detracts considerably from the weight that the court would give to that evidence. The uncertainty about whether Barry actually still owned the property listed in exhibit 146 as of the date of the alleged conversion is heightened by his testimony about the tools listed on that exhibit. While stating that he no longer owned some of those tools because he had replaced them, he proceeded to say that all of the tools on exhibit 146 were also listed on exhibit 163. In light of this uncertain evidence regarding the items listed on exhibit 146, the court ultimately views exhibit 163 as the exhaustive list of items of personalty underlying Barry's conversion claim.

The court has little confidence in the integrity of much of Barry's evidence about the value of the property that he claims was converted by one or more of the defendants, and in several instances, the record establishes that he is not even the owner of property for which he seeks relief. A number of the items included on exhibit 163 are located on the park premises. Another, the Chevrolet bus (number 27 on exhibit 163), is located at David Prescott's house. On this issue, the court relies on the testimony of defendant David Prescott. The court will order that the plaintiff is entitled to recover those items.

14

As identified by number in plaintiff's exhibit 163, that property items consist of items 3-5, 13-19, 22, 25, 27, 30, 33, 35-36, 47, 50 and 52.[12]

Barry seeks an award of damages to compensate him for his inability to use the equipment while it had been in the defendants' possession and for lost profits arising from its unavailability. Even if these damages are within the scope of a claim for conversion, there is no evidence that would allow an assessment of such damages, and this element of Barry's damage claim must be denied.

Several material flaws undermine Barry's claim to the remaining personalty or to an award of damages based on the alleged conversion of those items. First, two of the most valuable items, as Barry assesses those values, are a backhoe and dozer (the first two items listed on exhibit 163). The evidence, however, plainly establishes that in 1988 Barry conveyed ownership of those two pieces of equipment to a third person, Wesley Leighton. *See* plaintiff's exhibit 165 (bill of sale). In other words, Barry does not even own some of the property that he claims was unlawfully converted. Barry insists that he has a right to acquire them back from Leighton, and he therefore claims that he is entitled

---

[12] Some of these items are also listed on plaintiff's exhibit 146: the 1968 Ford dump truck model F-8000; the 1963 Chevrolet 2 ½ ton dump truck; the foundation panels; and the 3-axle low bed trailer.

In a counterclaim, Leo alleges that at least some of the equipment that is the subject of Barry's conversion claim is partnership property and not Barry's. As is noted below, Leo does not appear to make a substantive argument regarding the question of title. It therefore appears that Leo has waived any such claim. However, if the passing references on this issue contained in Leo's written summation are sufficient to preserve the dispute of ownership, then the court would find that these items of personalty are probably owned by Barry rather than by the partnership. As Barry pointed out during his testimony, he either paid for those items or provided the consideration that resulted in his acquisition of them. To the extent that money changed hands, the money could only have been Barry's, because the business had no cash to speak of. And to the extent that Barry worked for the items or bartered for them, the labor or traded items were hers. Absent some better evidence that Barry obtained these items in his capacity as a partner rather than individually or on behalf of his contracting firm the court finds that it is more likely that he acquired them for his personal benefit, although, particularly when his relationship with Leo was better, he may have used the equipment to further the trailer park business.

to pursue a claim for their conversion. Whether or not such an arrangement exists,[13] the fact remains that Barry does not own those two pieces of equipment, and consequently he does not have a claim for any conversion of them. *See Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798, 800. His insistence to the contrary, particularly when combined with the other circumstances noted below, suggests more generally that his claims for conversion are affected by overreaching.

Barry's claim for property that he does not own also casts doubt on his claim for other items of property that, according to the defense, Barry had actually given to other people. This group of property includes, for example, two boxes of tools and a portable generator (items 12 and 51 on exhibit 163). It also affects the court's assessment of Barry's testimony that a number of other items of his property are located on the park premises, when competing defense evidence indicates that those items of property are not there. Plaintiff's exhibit 163 includes many items of personalty that Barry describes as "missing." David Prescott, who, of all the defendants, knows the most about the whereabouts of property that Barry left behind at the park, has not seen most of them at the trailer park and does not know where many of those items are located. The record suggests that Barry did not file any insurance claims for the loss of any of this missing property, even though he had insurance on some of those items.

The record does not reveal any principled basis on which the court should give greater weight to Barry's testimony on this issue than to that of the defendants. The court recognizes that some of Barry's property is at the park, and earlier in this order, the court has directed that the defendants return these items to Barry. The court further accepts evidence that some material that Barry kept in the apartment where he resided on the park grounds ended up in the hands of the defendants.[14] Nonetheless, David Prescott in

---

[13] The bill of sale recites that Barry conveyed the equipment to Leighton as "payment in full. . .for services rendered," which is not suggestive that Barry retained a right to regain ownership of that property.

[14] This is demonstrated through the pretrial discovery process, where, for example, business records that Barry kept in his apartment were produced to him by the defendants as discovery. However, subsequent to the time Barry was excluded from the apartment, he had limited access to the premises pursuant to the parties' agreement and court order.

particular testified that the other items are not on the trailer park premises. The evidence is insufficient for the court to conclude that the defendants converted the items that none of the parties can account for. Those items consist of items 7, either 9 or 10,[15] 20-21, 23-24, 26-29, 31-32, 37-38, 39-41 (these are firearms, some of which have been returned to Barry), 42-46 and 53-56.

There is a third category of items of personalty that Barry left behind on the trailer park premises but that one or more of the defendants subsequently discarded or junked because of the condition of those items. The condition of those items prompted the town's code enforcement officer, Stewart Brooks, to intervene. When Brooks became the municipal CEO in 1994, he inspected the trailer park grounds a number of times. As part of this process, he had direct contact with Barry. (He also visited the park premises other times when Barry was not there.) Because of the number of decrepit vehicles, vehicle parts and equipment, he considered the park to be a junkyard and instructed Barry to clean it up. Barry told Brooks that he would do so when he was ready, but Barry in fact never did. Brooks eventually addressed the issue with Leo. Brooks' testimony about the condition of the property at issue corroborates the accounts of the defendants, including, for example, that of Irene Higgins who testified that pieces were falling off of some of the vehicles and that trees were growing through them.

As a result of this, and at Brooks' urging, the defendants arranged to remove the offending vehicles and equipment to junk them. These items included the following, as listed on plaintiff's exhibit 163: 6, 8, either 9 or 10,[16] 34, 48 and 49. Although the evidence demonstrates that one or more of the defendants were responsible for disposing of these items of property, Barry' conversion claim based on these items fails for two reasons. First, the court infers that Brooks encouraged Leo to dispose of these items – after Brooks was unsuccessful in his efforts to have Barry do so -- because Brooks concluded that their condition compromised public safety. Accordingly, when Leo and

---

During some of the time he was in the apartment, he was there alone. Thus, the defendants are not necessarily responsible for the loss of any property that he kept there.

[15] As David Prescott testified, one of the Chevrolet four-wheel drive trucks was missing, and other was junked.

[16] *See* note 13 *supra*.

other defendants acceded to Brooks' recommendation that they remove the property from the park and dispose of those items in a more suitable location, they did so in the public interest. Those acts were privileged. *See* RESTATEMENT (SECOND) OF TORTS § 265 (1965). That Brooks did not commence a land use enforcement action against Leo does not undermine the applicability of this privilege. Rather, the evidence demonstrates that Leo, directly or through the other defendants, cooperated with Brooks to remediate the problem.

The second circumstance that is fatal to Barry's conversion claim is one that affects all aspects of his claim for conversion: the quality of evidence on which Barry relies to press his claim for conversion damages. The proper measure of damages is the fair market value of the property at the time of the alleged conversion. *See Newbury v. Virgin*, 2002 ME 119, ¶ 16, 802 A.2d 413, 417. Here, Barry presented evidence quantifying his damages claim for virtually all of the individual items that he claims were converted. However, the court concludes that the record evidence does not allow a proper assessment of the value of the personalty, consistent with the correct measure of damages, that Barry contends was converted by the defendants. Thus, even if the evidence established that the defendants tortiously converted *any* items of Barry's property, the evidence does not reveal the amount of any damages that Barry would be entitled to recover.

There are several reasons why the court is unable to place any confidence in the amount of damages that Barry claims here. First, the extent to which Barry's evidence conforms to the correct measure of damages is not at all clear. The values that Barry assigns to some of the items of personalty are, in his view, the cost that he would incur to replace those allegedly converted items rather than the actual value of the items themselves. Replacement value is not the correct measure of damages. Also, Barry testified that the values set out in exhibit 163 are his estimates of the items' "value to me." He went on to state that some of those values are greater than the value of the consideration (which sometimes included other property in trades, or labor) he provided to the seller, which raises substantial questions of whether the personal value he attaches to those items is equivalent to their market value.

The second problem, which may affect a greater number of items, is the inherent uncertainty of the values that Barry has proposed. Flaws in his assessment of value are seen in many instances. Those problems are evident in Barry's contention that the value of even a single junked vehicle is as much as $7,500.[17] Because the municipal CEO concluded that they were junk and, for that very reason, insisted that they be removed from the premises, the court is unable to find that they had the values that Barry contends. The evidence also includes numerous instances where, by comparing values listed on plaintiff's exhibits 146 and 163, Barry argues that those values have increased significantly. For example, Barry valued foundation panels at $7,500 in 1981; as of the time of trial, in his view that value increased to $12,000. Over that same period of time, the value of a three-axle flatbed trailer increased from $3,000 to $5,000. He also testified that even though he paid as little as $500 for a Chevrolet bus, it was worth $4,000 when it was allegedly converted. According to his testimony, he provided one day's labor in exchange for a septic pump that is worth $9,000. Similarly, Barry testified that over time, property that one would expect to depreciate in value actually lost little or no value at all. These items include a stove and other household items. Barry also acknowledged that in at least one instance, his assessment of value was a guess.

All of this calls into question Barry's opinion regarding the value of any of the items he alleges were converted. Other questions about the liability claim itself, as discussed above, detract from Barry's attempt to prove the conversion claim. These questions are sufficient to preclude an order of relief, except for a requirement that the defendants turn over to Barry those items identified above, which are presently in the possession of one or more defendant.

**Unlawful eviction**

The last of Barry's claims alleges that he was unlawfully evicted from the apartment and that he is entitled to relief under 14 M.R.S. § 6014. Statutory remedies arising from an unlawful eviction consist of actual damages, subject to an award of at

---

[17] That vehicle happens to be a 1972 Lincoln Continental (item 49 on plaintiff's exhibit 163), which fell apart when it was hauled off. The *least* amount of value that Barry assigns to one of the junked vehicles may be $2,000, which is Barry's opinion of value for an Isuzu vehicle that may have been discarded (item 9 on plaintiff's exhibit 163).

least $250, and attorney's fees and costs incurred to prosecute a successful claim for unlawful eviction.

Barry resided in the apartment that is located above a garage. He moved into the apartment in the 1980's, when he was a partner in the trailer park business and held an ownership interest in the property. As is noted above, Barry subsequently divested himself of that ownership interest in the park premises and relinquished his status as a partner. However, he continued to reside at times in the apartment. Initially, because he did so with the knowledge and consent of Leo (now by then was the sole owner of the property), his occupancy of the apartment was permissive. Then, in June 1993, Leo caused Barry to be served with a document entitled "NOTICE OF TRESPASS." *See* defendant's exhibit 4. The notice, which recited that it constituted the type of notice that could lay the groundwork for a criminal prosecution for criminal trespass under 17-A M.R.S. § 402(D) or (E), purported to prohibit Barry from entering onto the trailer park. Nonetheless, Barry continued to use the apartment.

Access to the apartment, which is located on the second floor of the building and above a garage space, is gained by an exterior set of stairs. At some point, the stairs were removed. The stairs were in poor repair, and this is as good an explanation as any revealed in the record for their removal. This occurred during one of Barry's many extended absences from the trailer park. When he returned, Barry began to use a ladder to get to the apartment. There were also several incidents were the apartment locks were changed, but Barry was able to use the apartment anyway. These events culminated in an incident that occurred in May 2002, nearly nine years after Leo issued the trespass notice. Barry had called the Penobscot County Sheriff's Department because of a disagreement about his use of the apartment. Deputy Josh Tibbetts was dispatched to the scene. Leo or another family member asked Tibbetts to remove Barry from the trailer park because, Leo said, Barry did not have a right to be there and was not wanted there. Barry told Tibbetts that he agreed that he was not an owner of the property but explained that there was an ongoing dispute about his partnership rights and that the matter was civil in nature. Barry also advised that he had not been living at the apartment but kept some personal belongings here. Barry, who had driven to the park in a vehicle with Connecticut license plates, refused to provide Tibbetts with an address for his residence.

20

Nonetheless, after Tibbetts looked at a copy of the deed, he instructed Barry to leave the premises or face arrest. Tibbetts agreed to let Barry gather some of his property and papers, which he took in a suitcase. As he left, Barry warned the others not to enter the apartment because there were guns pointed at the doors. Barry has returned to the premises only several times since he was removed. Those return trips were by agreement of the parties or by court order.

Based on the circumstances of his removal from the park premises, Barry claims that he was evicted without process of law and is entitled to an award of damages. Of the defendants in this action, Leo, as the property owner and who had direct involvement with Barry's removal from the property, is the respondent to this claim.

Leo first argues that the provisions of section 6014 cannot provide Barry with relief, because he had no right to be present on the premises in the first place. Section 6014 provides a "tenant" with a cause of action against a "landlord." Evictions must be effected under the forcible entry and detainer statutes, 14 M.R.S. §§ 6001 *et seq.*, even when the subject tenancy is a tenancy at will. 14 M.R.S. § 6001(1), 6002. Among other things, a tenant at will is entitled, first, to notice of termination as prescribed by statute and, subsequently, to judicial process. *See* 14 M.R.S. §§ 6002-6003. These are the rights that Barry contends here were improperly denied to him. Leo argues that Barry's use of the apartment was not a tenancy at all.

The court concludes that after Barry was no longer a partner in the trailer park concern, he was a tenant at will and then a tenant at sufferance. "A tenant at will is 'one who holds possession of premises by permission of owner or landlord, but without fixed term.' A tenancy-at-will may arise even if the parties do not agree to payment of rent or a landlord and tenant relation does not exist." *See Frost Vacationland Properties, Inc. v. Palmer*, 1999 ME 15, ¶ 10, 723 A.2d 418, 421) (internal citation omitted). A tenancy at sufferance "is an interest which arises when one comes into possession by lawful title otherwise than by act of law, but retains such possession longer than he has any right." *Small v. Durango Partners, LLC*, 2007 ME 99, ¶ 12 n. 2, 930 A.2d 297, 301, *quoting Irving Oil Co. v. Maine Aviation Corp.*, 1998 ME 16, ¶ 7, 704 A.2d 872, 874.

Initially, Barry began his use and occupation as a function of his ownership interest in the property: he and Leo owned the park premises jointly, and he participated

21

in the management and development of the business, and so he clearly had the right to use the apartment as a residence. After Barry conveyed his ownership interest in the premises and was no longer a partner, he continued to use the apartment. Leo was fully aware of this situation, and so Barry's ongoing occasional occupancy was permissive. However, Barry otherwise had no right to possess or occupy the apartment. Then Leo took steps to remove Barry from the apartment and from the park itself, but until Tibbetts ordered Barry off of the property, those efforts were unsuccessful. Leo then resorted to seeking official intervention by requesting that Tibbetts remove Barry from the property.

After Barry no longer had a legal right to be present on the premises, but while Leo at least implicitly allowed Barry to continue his use of the apartment, Barry was a tenant at will. However, in June 1993, Leo arranged for Barry to be served with the trespass notice, thereby manifesting and demonstrating a withdrawal of any permission for Barry to continue using the apartment. Barry then became a tenant at sufferance. Barry's possession had been rightful because it was supported by Leo's consent (actual or implied), but once Leo withdrew that consent, Barry no longer was entitled to use the premises.

The next issue concerns what actions Leo was entitled to take in order to remove Barry, as a tenant at sufferance, from the premises.

First, a tenant at sufferance, as a disseisor, is not entitled to any notice of a termination of that tenancy. *Irving Oil Co.*, 1998 ME 16, ¶ 8, 704 A.2d at 875. Therefore, Leo was not required to provide Barry with any further notice to terminate the tenancy that he had converted to a tenancy at sufferance when he had Barry served with the trespass notice in 1993.

Then, there remains the question of whether Leo was entitled to use self-help to actually remove Barry from the premises. A property owner is entitled to enter the premises or engage in reasonable self-help methods in order to bring the occupancy of the tenant at sufferance to an end. *See Gower v. Waters*, 125 Me. 223, 228 (1926). Such a right exists even where the property owner has the option of seeking relief under the forcible entry and detainer statutes: such a statutory mechanism

> furnishes him [the property owner] with a convenient and speedy process to regain possession of his premises of which he may avail himself instead of resorting to an entry without legal process and with force, if necessary, and a

22

consequent liability to indictment in case of the use of excessive force, for which no exact standard can be prescribed for his guidance; but except so far as the statute regulating the use of this process is expressly or by necessary implication in conflict with the common law, it should not be held to deprive a landlord of his common law rights.

*Id.*[18] Thus, the question here is whether Leo's actions removing Barry from the premises were consistent with an exercise of his rights as allowed by the common law. To determine Leo's common law rights (i.e., his non-statutory rights) preserved under *Gower*, the court relies on the provisions of the RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT ("Restatement") (1977) to the extent that those provisions are not inconsistent with established Maine common law.

Under the Restatement, when "a speedy judicial remedy" exists and would entitle the property owner to recover the demised premises, that property owner may not resort to self-help in order to remove the occupant from the residence. *See* RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT ("Restatement") § 14.2 (1977). A typical forcible entry and detainer statutory process is considered to be such a remedy. *See id.*, cmt. b. Thus, under the Restatement alone, Leo would not be entitled to use methods of self-help, as he did here when he enlisted the aid of law enforcement, because Leo could have commenced a court action for forcible entry and detainer. However, *Gower* specifically preserves a property owner's right to use the alternative procedure of self-help. *See* Restatement at §14.1 cmt. 7 (listing Maine's FED statute as one that provides "a relatively quick remedy for recovering possession from the tenant improperly holding over," but also recognizing the holding in *Gower* that this statutory process is not exclusive to self-help). Therefore, notwithstanding the Restatement's bar against self-help in situations where a property owner, such as Leo, can seek prompt recourse in the courts, Maine common law preserves the owner's right to expel the occupant independently. The next question is whether Leo's self-help method comported with limitations on his common law right to self-help.

---

[18] In fact, the property owner in *Irving Oil* chose to invoke the statutory procedure under the FED statutes, commencing a judicial action that resulted in a termination of the tenancy at sufferance. Under *Gower*, however, a property owner retains the option of proceeding independently to recover the premises.

In those circumstances where a property owner is entitled to resort to self-help in order to recover the premises, those efforts are subject to three requirements: first, self-help must be exercised within a "reasonable time after the lease terminates;" second, it cannot cause physical harm to, or jeopardize the physical safety of the occupant; and third, it must be conducted with "reasonable care" for the protection of the occupant's personal property. *See* Restatement § 14.3.

Here, Leo failed to meet the third of these criteria. Under the Restatement,

> [o]ne attempting rightfully to use self-help to secure the recovery of possession against a tenant improperly holding over after the termination of his lease must exercise due care in the removal of the property of the tenant, or of others which is on the leased premises with the tenant's permission, to secure it from harm. The determination of the issue of the exercise of due care is a question of fact.

Restatement § 14.3 cmt. e. The defendants have not provided any authority that would suggest that this is not good law in Maine. Therefore, the court accepts this as law applicable here.[19]

As Leo knew, Barry kept a large number of items of personalty on the premises as of 2002, when Leo persuaded Tibbetts to remove Barry from the property under threat of arrest. However, Leo did not allow Barry anything close to an adequate amount of time to collect his property and move that property to a different location off of the trailer park grounds. This led to Barry's claim for conversion of that personalty. Although Barry will not prevail on the conversion claim, the basis for that outcome is not a finding that he was not forced to leave personal property behind. In fact, Leo orchestrated a situation where Barry was ordered off of the trailer park grounds, leaving a significant collection of personalty behind. Leo therefore exceeded the limitations on his rights to self-help as defined by the Restatement, and the eviction was therefore improper.

There is also a legitimate question of whether Leo met the first of the three requirements noted above, requiring timely action to dispossess the tenant after the tenancy is terminated. The commentary to the Restatement explains that prompt self-help is more likely to avoid a belligerent response from the occupant, because if the property owner delays efforts to recover possession of the premises, the occupant may

---

[19] The Law Court has cited other portions of this Restatement with approval. *See Small*, 2007 ME 99, ¶ 12 n. 2, 930 A.2d at 301.

24

come to believe that despite the apparent termination of the tenancy, the owner again is permitting him to remain onsite – causing the occupant to be surprised when, after a substantial delay following the termination of the tenancy, the owner renews efforts to exclude the occupant. *See* Restatement § 14.3 cmt. c. Here, Leo waited a very long time before engaging in the self-help that was sufficient to remove Barry from the apartment. However, during much of that duration, Leo engaged in a number of acts to try to prevent Barry from being able to use the apartment, and this should have been sufficient to put Barry on notice that he was no longer welcome there. That notice was arguably sufficient to avoid the problems that this requirement is designed to prevent.

Because Leo exceeded his common law rights to regain possession of the apartment because he failed to take reasonable steps for allow for the protection of Barry's property, the court need not reach the question of whether his acts of self-help were timely. Even if self-help was not foreclosed by the substantial delay between his initial effort to terminate Barry's occupancy and the actual removal, Leo failed to meet the additional requirement of allowing Barry's property to be protected. Consequently, the court concludes that Barry improperly terminated Barry's use of the apartment and that, because Barry was a tenant, albeit one at sufferance, that removal amounted to an eviction and entitles Barry to relief under section 6014.

The categories of statutory relief at issue here are the greater of $250 or Barry's actual damages caused by the improper removal, and attorney's fees. Barry's actual damages could take two forms: first, the loss of the apartment as a residence; and, second, the loss of property resulting from Leo's actions to exclude Barry from the property without either the process allowed by statute or an act of self-help that included steps reasonably designed to protect against such a loss.

Barry has not established actual damages caused by the termination of his access to the apartment for use as a residence. The evidence demonstrates that Barry spent substantial amounts of time living elsewhere. This is demonstrated by Barry's acknowledgement to Deputy Tibbetts that he (Barry) did not reside in the apartment but used it as a repository for his personal belongings. In fact, on the day when Tibbetts ordered Barry off of the property, Barry was driving a car registered in Connecticut.

Additional testimony from other witnesses reveals confirms Barry's long absences from the trailer park.

Additionally, Barry was fully on notice that Leo did not want him to live in the apartment. In fact, Barry acknowledged that he viewed receipt of the trespass notice as a step in the eviction process. Although Barry received the trespass notice years prior to the 2002 removal, Barry had surrendered any ownership interest in the premises, and he was no longer a partner to the trailer park. Leo then provided him with written notice that he was no longer entitled to enter onto the premises. Although Leo did not enforce the effort to exclude Barry through legal process, members of the Higgins family removed the stairway because of its deteriorated condition, and they changed the locks on the apartment doors. All of this shows that Barry had no legal right to continue using the premises and that he knew of affirmative efforts to exclude him from those premises. He continued to use the apartment, albeit only to a limited extent, at his peril. And for the reasons noted above, Leo was within his rights to use self-help methods to prevent Barry from using the premises, failing to do so properly only because he failed to take reasonable steps to protect Barry's property.

The second aspect of any claim for actual damages could involve the property. However, for the same reasons that undermine Barry's claim for money damages arising from any conversion of his personalty, he has not proven actual damages arising from damage to or loss of that property. This failure of proof germane to the separate tort claim for conversion also forecloses a finding that Barry has proven actual damages arising from an unlawful eviction, based on damage to or loss of the same property that is at the center of that conversion claim. Barry also argues that he is entitled to compensation for the loss of use of those items of property that have been in the defendants' possession since 2002. As is noted above, however, there is no suitable evidence that would allow a principled assessment of how much income, if any, he has lost due to his inability to use some of his equipment.[20]

---

[20] In the context of his conversion claim, the court has already found that Barry has not established that the defendants ever were in possession of many of the items of property that he claims were converted. That means that in the context of the unlawful eviction claim, Barry has no claim for damages due to the loss of use of such property arising from an unlawful eviction, because Barry has not established that the defendants deprived

Because Barry has not proven actual damages resulting from an unlawful eviction, then under section 6014 he is entitled to an award of $250. Barry is also entitled to attorney's fees associated with this limited element of the case. Barry may file an affidavit on attorney's fees within 21 days of the date this judgment is entered on the docket. Leo may file a response to that affidavit within 14 days of the date he receives Barry's submission.

### Leo's counterclaims

In a counterclaim, Leo alleges that Barry collected rental payments associated with the trailer park lots and failed to turn over those payments to the business. Additionally, in a second count of the counterclaim, Leo alleges that Barry converted personal property owned by him as part of the trailer park business. In his summation, however, Leo does not advance any substantive arguments in support of either count of his counterclaim, and the court deems those claims waived.

### Costs

As is discussed above, Barry is entitled to an award of attorney's fees and costs incurred for the prosecution of his statutory claim of unlawful eviction. Beyond this, the allocation of the parties' court costs rests on a functional analysis to identify which party has prevailed on the merits of the claims presented in the case. A functional analysis is invoked to identify the prevailing party, which means that "the court must look at the lawsuit as a whole to determine which party was the winner and which the loser." *Seacoast Hangar Condominium II Association v. Martel*, 2001 ME 112, ¶ 31, 775 A.2d 1166, 1174 (internal punctuation and citation omitted). Barry will prevail on his claim for unlawful eviction, but his damage award is nominal. He will also prevail on a limited part of his claim for conversion. On the remaining claims he has pressed, the outcomes will be adverse to him. When this action is considered as a whole, the court concludes that the defendants are the prevailing parties. Accordingly, except for costs of court that

---

him of those items. At best for Barry, any damages for loss of use would be limited to his inability to use the equipment that was in the possession of one or more of the defendants. In this record, there is no persuasive evidence about Barry's business income, or about how much income he claims he lost because of the equipment *he claims* remained in the defendants' possession -- much less about how much lost income can be ascribed to the particular items of property that Barry has shown were in the defendants' possession after he was removed from the trailer park in 2002.

are within the scope of attorney's fees and expenses generated by Barry's claim for unlawful eviction, the defendants are awarded their costs of court.

The entry shall be:

On counts 1, 2 and 5 of the complaint, judgment is entered for the defendants. On count 3 of the complaint, partial judgment is entered for the plaintiff and against defendants Leo Higgins and David Prescott. Those defendants shall return items of personal property identified in this judgment. On other aspects of count 3, judgment is entered for the defendants. On count 4 of the complaint, judgment is entered for the plaintiff and against defendant Leo Higgins in the amount of $250, plus pre-judgment interest at the annual rate of 1.41%, post-judgment interest at the annual rate of 6.41%, and reasonable attorney's fees and costs for prosecution of the claim in count 4.

On the counterclaim of defendant Leo Higgins, judgment is entered for the counterclaim defendant (plaintiff).

Aside from costs that may be awarded to the plaintiff on count 3 of the complaint, the defendants are awarded their costs of court.

Dated: April 7, 2010

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

Judgment entered upon the docket:   4/15/2010.